UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LARRY D. MEYERS,<br><br>    Defendant. | No. 1:19-cr-429 (PAE) |

## SENTENCING MEMORANDUM ON BEHALF OF LARRY D. MEYERS

<div style="text-align:right">

Jonathan R. Marx (admitted pro hac vice)
Casey E. Lucier (admitted pro hac vice)
Louis D. Greenstein (admitted pro hac vice)
McGuireWoods LLP
434 Fayetteville Street, Suite 2600
Raleigh, NC 27601
Phone: (919) 755-6600
Fax: (919) 755-6699

*Counsel for Defendant*

</div>

1

A Marine Corps veteran, husband, father of three school-age children, and until recently a successful businessman, Larry Meyers comes before this court at age 53 as a first time offender after pleading guilty to an antitrust violation. He fully accepted responsibility for his misconduct early, ███████████████████████████████████. Mr. Meyers admitted his actions, knows that he acted wrongly, and is prepared to accept the consequences of his wrongdoing.

Mr. Meyers, through counsel, respectfully requests that the Court grant him a downward departure or variance from the advisory Guidelines range, and sentence him to a non-custodial sentence. Mr. Meyers submits this Sentencing Memorandum in advance of his sentencing hearing on November 21, 2019 to explain why the Probation Officer's recommendation of time served, no fine, and supervised release is sufficient but no greater than needed to achieve the statutory purposes of sentencing under 18 U.S.C. § 3553(a).

In short, Mr. Meyers' history and characteristics, the circumstances of the offense, and the need to avoid unwarranted disparities all weigh against a sentence of incarceration. Nor do the considerations of § 3553(a)(2) compel such a sentence. Mr. Meyers pled guilty to a non-violent offense, conspiracy to violate the Sherman Act, that results in sentences of probation or home confinement more frequently than incarceration. The government is not recommending incarceration. Moreover, Mr. Meyers is a respected member of his community with a previously unblemished history of military and community service. Mr. Meyers' family is already under financial strain from the consequences of his actions, including the loss of his job, and Mr. Meyers is the primary (and until recently, sole) breadwinner for his family. In these circumstances, the statutory purposes of sentencing and the interests of justice are best served by keeping Mr. Meyers in the community, where he will work to continue providing for his family.

I.      **Characteristics of the Defendant: Personal Background and Employment**

Larry Meyers, age 53, is a married father of three children who has lived and worked in New York his entire adult life. Mr. Meyers served in the Marines and was honorably discharged. He earned his undergraduate and master's degrees in New York at Columbia and Fordham, respectively. As the letters of support indicate, Mr. Meyers is a valued member of his community. He is actively involved in his children's lives and schools, and with his family's church. Peers regard him as loyal, dependable, and ethical, despite the lapses that brought him before the Court.

Following his military service, Mr. Meyers pursued a career in the financial services industry. Mr. Meyers was until recently the sole breadwinner in his family. His wife, a former professional violinist who has been the primary caretaker of the Meyers' three children, has begun giving music lessons, but does not earn enough to support the family.

After persevering through a series of mergers and resulting layoffs at various banks early in his career, Mr. Meyers eventually settled into the stock lending business. He became a specialist in a small segment of the stock lending world known as pre-release ADR trading. He learned that business at ING Groep NV and BNP Paribas S.A. before taking a job at Banca IMI Securities Corp. (BISC), the U.S. broker-dealer subsidiary of a large Italian bank. At BISC, Mr. Meyers was the head of the securities lending desk for fifteen years. After thirteen years, he was promoted to Managing Director and given the additional title of Head of U.S. Equities.

As a small broker-dealer, BISC did not benefit from economies of scale. Through Mr. Meyers, BISC successfully built business relationships with potential counterparties. Mr. Meyers' hard work, carefully cultivated relationships, and managerial skill allowed him to grow BISC's stock lending desk considerably. In one performance review, BISC's then-CEO said that

Mr. Meyers' relationships were BISC's only competitive advantage. Mr. Meyers' desk was consistently among the most profitable at BISC, and grew to support the employment of several other traders.

The collusive communications in the pre-release ADR market that bring Mr. Meyers before the Court began in 2012, after Mr. Meyers had led the pre-release ADR desk at BISC for over a decade. BISC terminated Mr. Meyers in 2016 when it closed its entire securities lending desk.

Determined to make that setback temporary, ███████████████████████████ ███████████████████, Mr. Meyers built yet another business from scratch. INTL FCStone hired Mr. Meyers to build a prime brokerage business. He did so with mixed success. Mr. Meyers was able to develop substantial business, enough to support several traders under him. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████. INTL FCStone ultimately requested Mr. Meyers's resignation when the government filed these charges against him, and he obliged. Notably, the prime brokerage business involved no pre-release ADR trading.

Mr. Meyers is especially disappointed in his conduct that brings him before the Court because he strives to be the type of person who speaks out against unethical behavior. Unfortunately, Mr. Meyers' regrettable choices have cost him his reputation, two jobs, and more. They have put his freedom and his family's well-being at risk. But Mr. Meyers recognizes his good fortune that his mistakes have not cost him the love and support of his family and many friends, who have helped him stay afloat emotionally and materially during these difficult times.

Now, hopeful that the Court will permit him to remain in the community, Mr. Meyers continues to actively seek employment. He has several pending job interviews. He also provides consulting services whenever the opportunity presents itself, to put his skills to work and support his family.

### II.  Circumstances of the Offense and Mr. Meyers' Role

Mr. Meyers acknowledges that his offense is serious. The PSR accurately recounts the basics of the offense. However, Mr. Meyers respectfully requests that the Court take into account certain mitigating facts about his offense. In particular, Mr. Meyers did not instigate the unlawful agreements with other ADR brokers. Rather, Mr. Meyers chose to join those agreements largely in reaction to a newly-aggressive market participant, the Industrial and Commercial Bank of China Financial Services LLC (ICBCFS). ICBCFS's employees insisted on cartel behavior and plausibly threatened economic retaliation against market participants who refused. Although Mr. Meyers joined collusive agreements on a few dividend arbitrage trades before ICBCFS began threatening other market participants, during the height of the cartel, ICBCFS was the indisputable ringleader, instigator, and enforcer. Mr. Meyers acceded to these illegal demands by other market participants for a variety of reasons, all of which he now recognizes as ill-considered rationalizations. He acknowledges that he should have refused to participate, even if it meant losing his job due to loss of revenue. Mr. Meyers is now paying the price for that decision.

### III.  Avoiding Unwarranted Disparities

The Court's mandate to avoid unwarranted disparities supports a non-custodial sentence for Mr. Meyers' offense of violating the Sherman Act, as antitrust offenses produce non-custodial sentences more often than not. In 2018, courts sentenced 53 defendants nationwide for

antitrust offenses. Of those, only 32% received an active prison sentence.[1] The 2017 figures prove similar: 31 defendants were sentenced nationwide for antitrust offenses, of whom only 42% received a prison sentence or a split sentence.[2] Recently, even two defendants convicted after trial of LIBOR manipulation – a competition offense with a far greater effect on the financial markets – avoided prison time. *See e.g., United States v. Connolly*, 1:16-cr-370 (S.D.N.Y.) (home confinement for two defendants convicted at trial of fraud for LIBOR-rigging and released on bond during pendency of case).

Sentencing Mr. Meyers to time served and supervised release will not produce an unwarranted disparity with other defendants. Rather, as courts have recognized, non-custodial sentences in antitrust cases are fully appropriate when warranted, as here, by the circumstances. Mr. Meyers' early guilty plea, lack of criminal history, demonstrated remorse, strong community ties, ███████████████████████████████████████████ ███████████████ .

### IV.   The PSR and Explanation of Volume of Commerce Calculations

Mr. Meyers does not have any objections to the final PSR, but does have one clarification. PSR Paragraph 23 implies that the CEO of Banca IMI Securities Corp. approached Mr. Meyers to discuss the compliance implications of a depositary's move from bilateral negotiations to auction-style bidding for pre-release ADRs. The converse is true. It was Mr.

---

[1] Table 4, *United States Sentencing Commission Statistical Information Packet, Fiscal Year 2018, Southern District of New York* at 8, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/nys18.pdf (last visited Nov. 4, 2019)

[2] Table 4, *United States Sentencing Commission Statistical Information Packet, Fiscal Year 2017, Southern District of New York* at 7, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/nys17.pdf (last visited Nov. 4, 2019)

Meyers who expressed his concerns within BISC, including to its then-CEO, regarding whether the depositary's move to an auction system was consistent with securities law compliance. The Probation Officer's rationale for her sentencing recommendation is clear (and correct) that Mr. Meyers raised concerns about the auctions to his CEO, not the other way around. *See* Docket No. 32, pages 23-24.

Mr. Meyers also agrees that the Probation Officer calculated the Sentencing Guidelines correctly. In particular, Mr. Meyers agrees with the volume of commerce calculations under U.S.S.G. § 2R1.1 propounded by the government and adopted by the Probation Office. (As the government notes, the same methodology has been adopted by other sentencing courts in related cases). The total amount of foreign withholding taxes avoided by engaging in dividend arbitrage transactions represents the true economic substance of the "volume of commerce" for which Mr. Meyers should be held responsible. Understanding why this is so requires some explication of the market for pre-release ADR lending, which we undertake below.

An American Depositary Receipt, or ADR, is a security issued by a U.S. bank that trades on a U.S. stock exchange, but represents ownership in a foreign company. ADRs are issued by U.S.-based "depositary" banks. ADRs correspond to ordinary shares of the foreign company, trading on a foreign exchange. Thus, ADRs can be tendered to a U.S. depositary bank in exchange for ordinary shares of the same company in a foreign market, and foreign ordinary shares can be tendered in exchange for ADRs in the U.S.

Normally, a depositary bank releases an ADR only once the corresponding ordinary share is delivered to the depositary bank's local agent in the foreign market. But a "pre-release" ADR is different. A depositary releases a pre-release ADR to a U.S. customer before the foreign ordinary share is delivered to the depositary's local agent in the foreign market. To obtain a pre-

release ADR in the U.S. a borrower must represent to the depositary bank that it (or a customer on whose behalf it is acting) beneficially owns the underlying ordinary share in the foreign market.

The "pre-release" market developed alongside the ADR market. It began as a way to ensure liquidity in the ADR market in the case of settlement failures, *i.e.* where a seller failed to deliver shares, jeopardizing the purchaser's further obligation to deliver those shares. Once the trade in the foreign market settled, the pre-release ADR would be returned to the depositary, with the borrower charged interest and fees.

But over time, the pre-release ADR lending market evolved so that dividend arbitrage made up the majority of trades (by revenue). The purpose of dividend arbitrage trades was to structure ADR lending transactions that rendered dividends exempt from withholding taxes imposed by the foreign jurisdictions where the corresponding ordinary shares traded.[3]

Dividend arbitrage was an effort to legally avoid those withholding taxes. By borrowing ADRs through offshore corporate structures in jurisdictions with favorable tax treaties, or by placing the ADRs with tax-indifferent borrowers who could certify an exemption from tax withholding, market participants attempted to lawfully avoid the otherwise-applicable foreign withholding taxes on ADRs' dividends. Those avoided taxes were captured and functionally

---

[3] Like the U.S., many European nations impose withholding taxes on outbound dividend income paid to foreign owners of securities. This is a mechanism for enforcing local tax law against foreign recipients of passive income, against whom tax enforcement is otherwise difficult or impossible. The payor – here the securities issuer – is responsible for withholding the taxes at the source. Thus, a foreign shareholder receiving dividends from a U.S. company could expect to have a substantial portion of the dividend withheld as U.S. tax, unless a tax treaty lowered the withholding rate or the recipient was entitled to some other exemption. Similarly, U.S.-based holders of ADRs representing ownership of foreign stock issuers can expect to have foreign taxes withheld on those ADRs' dividends unless there is a legal basis for mitigating the tax withholding, such as claiming benefits under a tax treaty.

divided among the multiple institutions involved in the chain of securities lending transactions that placed the ADR with the tax-advantaged end user. When market participants negotiated prices for pre-release ADR trades, they did so in "all-in" terms. The gist of "all-in" pricing was to divide the economic value of the avoided taxes among the links in the chain of lenders.

Thus, as the government, Probation, and sentencing courts in related cases have all agreed, the Guidelines volume of commerce in this case is properly based on the avoided taxes on BISC's pre-release ADR lending trades within the antitrust conspiracy. Mr. Meyers has no objection to the methodology propounded by the government and Probation Office for calculating those taxes, or to its application in the PSR.

[redacted]





Case 1:19-cr-00429-PAE   Document 34   Filed 11/12/19   Page 12 of 16



12



## VI.  Conclusion

Mr. Meyers is a first time offender with a wealth of mitigating facts in his favor: a non-violent offense that typically results in non-custodial sentences, a lack of criminal history, an early guilty plea, family and community support, a record of honorable military service, ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. There is no reason to believe Mr. Meyers will reoffend or pose a danger to the public.  The conduct that brings him before the Court remains an aberration in his otherwise ethical and well-lived life.  The government does not seek his incarceration, and a seasoned Probation Office does not recommend it.  Their reasoning is sound.  Similarly, neither the government nor the Probation Office seeks a fine, which Mr. Meyers cannot at present pay.  Mr. Meyers respectfully requests that the Court follow the recommendation of the Probation Office and sentence him to time served, no fine, and a reasonable period of supervised release.

Dated: November 12, 2019                              Respectfully Submitted,

                                                      McGuireWoods LLP
                                                      By:

                                                      /s/ Jonathan R. Marx
                                                      Jonathan R. Marx (admitted pro hac vice)
                                                      434 Fayetteville Street, Suite 2600
                                                      Raleigh, NC 27601
                                                      Phone: (919) 755-6600
                                                      Fax: (919) 755-6699
                                                      jmarx@mcguirewoods.com

                                        /s/ Casey E. Lucier
                                        Casey E. Lucier (admitted pro hac vice)
800 Canal Street
Richmond, Virginia 23219
Phone: (804) 775-7695
Fax: (804) 698-2153
clucier@mcguirewoods.com

/s/ Louis D. Greenstein
Louis D. Greenstein (admitted pro hac vice)
McGuireWoods LLP
2001 K Street N.W., Suite 400
Washington, D.C 20006-1040
Phone: (202) 857-2415
Fax: (202) 828-3310
lgreenstein@mcguirewoods.com

*Counsel for Defendant*

<u>Certificate of Service</u>

I hereby certify that on November 12, 2019, I caused a copy of the foregoing document to be filed on the ECF system of the Court, which will serve a copy on all counsel of record. In addition, I served a copy on counsel for the United States via email.

/s/ Jonathan R. Marx
Jonathan R. Marx (admitted pro hac vice)
434 Fayetteville Street, Suite 2600
Raleigh, NC 27601
Phone: (919) 755-6600
Fax: (919) 755-6699
jmarx@mcguirewoods.com