

**U.S. Department of Justice**

Antitrust Division

*Washington Criminal II*
*450 5th Street NW*
*Suite 11-300*
*Washington, DC 20001*

November 14, 2019

**VIA EMAIL & ECF (Redacted)**

The Honorable Paul A. Engelmayer
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 1305
New York, NY 10007
EngelmayerNYSDChambers@nysd.uscourts.gov

      Re:   <u>United States v. Larry D. Meyers, 19-cr-00429-PAE</u>

Dear Judge Engelmayer:

      The United States Department of Justice, Antitrust Division ("the government") respectfully submits this letter in advance of the November 21, 2019 sentencing of Defendant Larry Meyers to advise the Court as to relevant background and sentencing considerations ▌

## I.   <u>Background and Sentencing Considerations</u>

### A. Mr. Meyers' History and Characteristics

      Larry Meyers, age 53, is a former head trader on the securities lending desk of Banca IMI Securities Corp. ("IMI") and resides in Manhattan, New York. In his position as head trader on IMI's securities lending desk, Mr. Meyers borrowed and lent pre-release American Depository Receipts ("ADRs") on IMI's behalf and handled negotiations with U.S. depository banks for the rates at which IMI would borrow pre-release ADRs.

      Mr. Meyers graduated from high school in 1984 and entered the U.S. Marine Corps, where he served as an Aircraft Electrical Systems Technician and received two Rifle Expert

awards, a Sea Service Deployment Ribbon, a Good Conduct Medal, and four Meritorious Mast awards. He was honorably discharged in 1989. Mr. Meyers received his bachelor's degree in 1992 from Columbia University and a master's degree in business administration in 1999 from Fordham University. After working in securities lending at ING Barings and BNP Paribas, he joined Banca IMI in 2001, where he worked until 2016. Between 2016 and 2019, Mr. Meyers worked at INTL FCStone Financial. He currently operates his own consulting firm, Inwood Hill Global Consulting LCC, which he formed in April 2019.

Mr. Meyers has no criminal history.

### B. Guilty Plea and Criminal Conduct

On June 27, 2019, Mr. Meyers pled guilty to a one-count Information (ECF No. 2) charging him with violating the Sherman Antitrust Act, 15 U.S.C. § 1, for his participation in a conspiracy to rig bids to borrow pre-release ADRs. From at least as early as March 2012 and continuing until at least August 2014, Mr. Meyers and his co-conspirators—IMI, other broker-dealers, and their securities lending employees—coordinated their bids to U.S. depository banks in an effort to suppress the rates at which they all could borrow pre-release ADRs.

Worldwide, there are thousands of publicly traded companies that list their shares of common stock only on foreign stock exchanges, not in the United States. Most U.S. investors are unable to purchase or sell such foreign shares, which also are known as "ordinary" shares. However, the U.S. Securities and Exchange Commission permits four U.S. depository banks to create financial instruments, known as ADRs, which each represent one or more foreign ordinary shares and can be traded in the United States. Through the purchase and sale of ADRs, U.S. investors are able to gain exposure to—including the ability to receive dividends from—companies whose ordinary shares are listed only on foreign exchanges.

In order to create an ADR in the United States, the depository bank is required to ensure that the corresponding ordinary share(s) are taken out of circulation in the foreign country. That process is known as "custodying" the ordinary shares. Subject to certain regulatory requirements, U.S. depository banks are permitted to release ADRs a short time before the foreign ordinary shares are custodied—ADRs sold or lent by U.S. depository banks in that circumstance are known as "pre-release ADRs."

Prior to September 2014, there was significant, predictable demand for pre-release ADRs that corresponded to ordinary shares of a number of foreign companies each time one of those companies was about to issue a dividend. That demand derived largely from the ability of U.S. financial institutions, via a series of short-term loans of the ADRs, to place the ADRs in possession of tax-advantaged institutions (such as public pension funds or university endowment funds) on the ex-dividend date (*i.e.*, the date on which the current holder of the ADR is entitled to receive the upcoming dividend). Because the tax-advantaged institutions holding the ADRs on the ex-dividend date were not subject to foreign tax withholding (the amounts of which varied over time and by the issuing company's home country, but typically ranged from 15% to 30% of the dividend), that "avoided tax" became available for distribution among all of the various institutions that participated in the transactions required to place the ADRs temporarily with the tax-advantaged institutions.

The division of the avoided tax among the various institutions participating in the series of short-term ADR loans historically was determined largely by bilateral negotiations, with each firm haggling for higher rates when it was the lender and for lower rates when it was the borrower.  For broker-dealers such as IMI, profitability was determined primarily by: (i) the number of ADRs it was able to borrow and then lend, and (ii) the spread between the effective rate it paid the U.S. depository bank to borrow the ADRs and the effective rate(s) it charged the investment banks, hedge funds, or other intermediaries to lend them the ADRs.

Prior to March 2012, IMI and other broker-dealers competed against one another both to contract with intermediaries who wanted to borrow pre-release ADRs (*i.e.*, downstream transactions) and to secure large allocations of pre-release ADRs on favorable terms from the U.S. depository banks (*i.e.*, upstream transactions).  Beginning no later than March 2012, though, IMI and its co-conspirators, through their securities lending traders such as Mr. Meyers, began coordinating their bids to the U.S. depository banks for the rates they would pay to borrow pre-release ADRs in an effort to suppress the rates at which they all could borrow pre-release ADRs.

In furtherance of the conspiracy, Mr. Meyers and his co-conspirators communicated through private chat rooms, phone calls, text messages, and in-person meetings.  During these communications, they reached agreements to suppress and eliminate competition by rigging bids to borrow pre-release ADRs, on many occasions agreeing they all would submit the same bid.  On at least 30 occasions within the period of the conspiracy, IMI reached an agreement with one or more co-conspirators as to the bids they would submit to U.S. depository banks for the rates they would pay to borrow pre-release ADRs.

### C. Volume of Affected Commerce Calculation

The volume of commerce attributable to a defendant for sentencing purposes in an antitrust case is the volume of commerce "done by him or his principal in goods or services that were affected by the violation."  U.S.S.G. § 2R1.1(b)(2).  In this case, the conspiracy targeted the portion of the dividend payments that otherwise would have been subject to foreign tax withholding.  The parties accordingly have agreed that the volume of affected commerce attributable to Mr. Meyers is equal to the avoided tax generated by pre-release ADRs that Mr. Meyers' employer, IMI, borrowed pursuant to rigged bids.

The government thus used the following methodology to calculate volume of commerce:

- The government identified specific transactions in which IMI employees demonstrably carried out the antitrust conspiracy by coordinating their bids with co-conspirators;

- The government identified the number of pre-release ADRs IMI borrowed pursuant to each such collusive bid;

- The government determined both (i) the dividend paid per share of each tainted pre-release ADR IMI borrowed and (ii) the foreign tax withholding rate that would have been applied to such dividends had they not been held by tax-advantaged entities over ex-dividend date;

3

- The government then calculated the dollar amount of "tax avoided" for each such share by multiplying its dividend rate by its associated tax withholding rate, and calculated the total "tax avoided" for each transaction by multiplying that per-share "tax avoided" figure by the number of pre-release shares of the ADR issue that IMI borrowed pursuant to its collusive bid;

- Finally, the government summed up the total "tax avoided" amounts of all the pre-release ADR shares IMI borrowed pursuant to collusive bids.

The government believes this methodology is a fair and appropriate way to calculate the volume of commerce attributed to Mr. Meyers for Guidelines purposes. The government followed this same methodology in calculating the commerce attributable to IMI, and a comparable methodology for co-conspirator International and Commercial Bank of China Financial Services ("ICBC") based on ICBC's bids and shares, as reflected in their respective plea agreements. *See* 19-cr-349-JPO (IMI); 19-cr-446-JPO (ICBC).

Based on this methodology, the government calculates the volume of commerce for Mr. Meyers to be $15,765,052. For an individual defendant like Mr. Meyers, the Guidelines fine range is from one to five percent of the volume of commerce, *i.e.*, $157,651–$788,253. *See* U.S.S.G. § 2R1.1(c)(1).

### D. Sentencing Guidelines Calculation

Pursuant to the Rule 11(c)(1)(B) Plea Agreement between the government and Mr. Meyers, the government does not recommend any specific sentence. (Plea Agreement, Govt. Ex. 1, June 27, 2019 Plea Hrg. ¶ 11). However, the government and Mr. Meyers jointly recommend that the Court apply the following Sentencing Guidelines analysis and calculations:

| | | |
|---|---|---|
| (a) | Base Offense Level, U.S.S.G. § 2R1.1(a) | 12 |
| (b) | Non-Competitive Bids, U.S.S.G. § 2R1.1(b)(1) | +1 |
| (c) | Volume of Commerce > $10M, U.S.S.G. § 2R1.1(b)(2) | +4 |
| (d) | Acceptance of Responsibility, U.S.S.G. § 3E1.1(a), (b) | -3 |
| (e) | Resulting Offense Level | 14 |
| (f) | Fine Range, U.S.S.G. § 2R1.1(c)(1) | $157,651–$788,253 |

(Plea Agreement ¶ 14). Because Mr. Meyers has no criminal history and is therefore in criminal history category I, his sentencing guidelines imprisonment range is 15-21 months.

### E. Restitution

In light of the availability of civil causes of action, which potentially provide for a recovery of a multiple of actual damages, the government and Mr. Meyers jointly recommend

that the Court not impose restitution. (Plea Agreement ¶ 19.) In antitrust cases such as this one, restitution is not mandatory pursuant to 18 U.S.C. § 3663A.





Respectfully submitted,

James J. Fredricks
Chief, Washington Criminal II
Antitrust Division
United States Department of Justice

By:  *[signature]*

Christina Brown, Trial Attorney
Katherine Stella, Trial Attorney
Antitrust Division, Washington Criminal II
United States Department of Justice
450 5th Street NW, Suite 11-300
Washington, DC 20001
(202) 598-4000
christina.brown@usdoj.gov
katherine.stella@usdoj.gov

cc:  Casey Lucier, McGuireWoods LLP
Jonathan Marx, McGuireWoods LLP
Louis Greenstein, McGuireWoods LLP